**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
DELTA DIVISION**

**EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION**                                                              **PLAINTIFF**

**V.**                                                              **CASE NO. 2:10-CV-168**

**IPS INDUSTRIES, INC. d/b/a
SPECTRUM PLASTICS, INC. d/b/a
SPECTRUM BAGS, INC.**                                                              **DEFENDANT**

## MEMORANDUM OPINION

This cause comes before the court on the parties' motions for summary judgment. Spectrum Bags, Inc. ("Spectrum") moves for summary judgment [104] on the Equal Employment Opportunity Commission's ("The Commission") Title VII sexual harassment and retaliation claims. The Commission moves for partial summary judgment [106] on various affirmative defenses advanced by Spectrum. Having considered the parties' submissions in this matter, the court is prepared to rule.

On September 30, 2010, Plaintiff EEOC filed this lawsuit on behalf of four women based on the alleged actions of a Spectrum employee, James Calhoun. The class now consists of five women, Shequita Henderson, Keisha Anderson, Brittany Beard, Dana Murray, and Cynthia Murphy, all temporary employees assigned to Spectrum's distribution center in Southaven, Mississippi during Calhoun's employment.

The Commission initiated this action on behalf of these class members under Title VII of the Civil Rights Act of 1964, and Title I of the Civil Rights Act of 1991, 42 U.S.C. 6 § 1981a.

1

This action is authorized by 706(f)(1) and (3) of Title VII and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a. This court has federal question jurisdiction over the action pursuant to 28 U.S.C. § 1331.

## **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [104]**

Spectrum is a global importer and wholesaler of plastic disposable goods, including printed bags for industrial applications and use in retail stores, restaurants, and supermarkets. In 2008 and 2009, Spectrum operated three distribution warehouses located in Cerritos, California, Edison, New Jersey, and Southaven, Mississippi. Due to the fluctuating nature of its business, Spectrum relies on temporary employees provided by local staffing companies to perform the day-to-day operations in its distribution warehouses, including fork lift drivers, office help, shipping and receiving clerks, and quality control personnel.

Upon hire, all Spectrum employees allegedly receive copies of the employee handbook containing the Company's anti-harassment policy. The Company also posts copies of its anti-harassment policy in the break rooms of its corporate headquarters and distribution warehouses, including the warehouse in Southaven, Mississippi. Certain testimony in the record reveals that the 1-800 complaint number as well as the numbers for Calhoun's supervisors had been erased and replaced with Mr. Calhoun's phone number in the Southaven warehouse. Spectrum also provides sexual harassment instruction and training to all new employees during their orientation and to all employees company-wide every two years. The parties point to conflicting testimony as to whether or not Calhoun received any such training. Calhoun testified that he did not provide any such training to the class members in this case because he assumed the staffing companies would do so.

Spectrum employed James Calhoun as the Warehouse Manager at its Southaven, Mississippi distribution center between August 18, 2008 and July 17, 2009. In that capacity, he reported to Executive Vice President and General Manager Robert Bailey, who in turn reported to Spectrum President Ben Tran. Calhoun's job duties included overseeing the general business operations of shipping and receiving in the Southaven warehouse. Calhoun had the authority to request temporary employees to perform various tasks at the warehouse from two temporary staffing companies, Working Solutions and Select Staffing. The parties dispute his authority to hire, fire, suspend, or formally discipline any Spectrum employees. Calhoun was suspended without pay on June 26, 2009, pending completion of an investigation into the allegations in this matter. Spectrum made the decision to terminate Calhoun for violating its sexual harassment policy, effective July 17, 2009.

Shequita Henderson began working for Select Staffing in December 2007. Select Staffing assigned Henderson to Spectrum's Southaven warehouse as a quality control clerk from May 12, 2009 to June 9, 2009. Though Henderson received paperwork containing Spectrum's sexual harassment policy, she did not know whether Spectrum had such a policy and never saw Spectrum's bulletins displaying the policy.

Henderson testified to the following incidents of alleged harassment: (1) Calhoun offered to take her out for drinks five to ten times; (2) Calhoun pushed his stomach against her back as he passed between her and a table; (3) when Henderson returned from lunch with an upset stomach, Calhoun raised her shirt, rubbed her stomach, and asked if she was pregnant. Henderson declined each of Calhoun's alleged invitations for drinks but never told him to stop or that his actions were unwelcome because she contends that Calhoun changed women's assignments or sent them home when they turned him down. Henderson ultimately reported

3

Calhoun's behavior to Select Staffing. The next day, Calhoun allegedly filed a Personnel Action Form terminating Henderson's employment.

Keisha Anderson began working for Select Staffing in May 2009. Calhoun interviewed Anderson, and Select Staffing assigned her to the Southaven warehouse as a quality control clerk from May 12, 2009 to June 10, 2009. Spectrum provided her with documentation containing Spectrum's sexual harassment policy. Anderson testified to having no knowledge of the policy or bulletins containing the policy. Anderson alleges the following instances of harassment: (1) Calhoun called her beautiful twice; (2) he asked her out for drinks once; (3) Calhoun participated in sexual joking with other female employees near Anderson; (4) he called her cell phone on a Friday night; (5) he asked for a hug; (6) he called her into his office and asked for some lip gloss from her lips; (7) and he scratched her leg. Anderson voluntarily left the company because she was uncomfortable working for Calhoun. She did not complain to anyone at Spectrum at any time. She did complain to someone at Select Staffing after her assignment had ended.

Brittany Beard initially met Calhoun while working at Radio Shack. Calhoun referred her to Working Solutions, where she began working in November, 2008. Calhoun interviewed and hired her to work in the Southaven warehouse from November 12, 2008 to December 1, 2008, and again from April 1, 2009 to June 10, 2009. Beard remembers seeing the bulletin detailing the sexual harassment policy, but she never read the entire posting. Beard alleges several instances of harassment including: (1) when she asked for work assignments, Calhoun responded "maybe he just likes looking at [her]."; (2) Calhoun invited her on two business-related outings; (3) he called her "beautiful", "baby", and "baby girl" at work and in text messages that read, "come kick it with me," "what the biz, baby girl," "what's up baby girl," and "come on I'll rub you."; (4) Calhoun engaged in open sexual conversations with other employees

4

regarding the size of his penis; (5) he made general physical contact such as patting her leg or rubbing her arm during conversation; (6) he discussed his extramarital affairs with Beard.

Beard requested a second opportunity to work at Spectrum despite enduring alleged sexual harassment during her first assignment at Spectrum. During her second assignment, Calhoun allegedly told various truck drivers at the warehouse that Beard was jealous of other women who came to see Calhoun at the warehouse. Beard allegedly confronted Calhoun about these jokes because it insinuated an improper relationship between Calhoun and Beard.

Beard and a friend once attended a party at Calhoun's house where only one other person was present. Beard quickly left when she realized that the gathering at Calhoun's house was not a party. Calhoun allegedly called her after she left and told her he was upset with her. She contends that he expressed his disappointment again the next day at work and assigned her to apparently less desirable work "on the line". Beard further testified that Calhoun reached around from behind Beard sitting at her desk to give her a hug and that he slapped her behind multiple times with his hand. Beard did not report to work at Spectrum or call in on June 11, 2009. Calhoun asked her shortly thereafter if she wanted to return. She told him that she wanted to return and asked him to stop touching her because it made her uncomfortable.

Calhoun terminated her employment shortly after this exchange allegedly due to attendance issues. Burns, a Working Solutions employee, called Beard to end her assignment June 12, 2009. During this conversation, Beard complained of sexual harassment. Four days later, Burns called Spectrum's Vice President of Operations, Robert Bailey, to inform him of Beard's sexual harassment complaint against Calhoun. Beard filed a charge of discrimination with the EEOC the next day, June 17, 2009. Spectrum received a copy on June 23, 2009.

5

Dana Murray worked in the Southaven warehouse through Working Solutions from July 2008 to April 30, 2009.  Murray testified to seeing various bulletins around the warehouse and being uncertain as to whether or not they contained the sexual harassment policy.   Murray alleges several instances of harassment: (1) Calhoun reached from behind her and wrapped his arms around her waist; (2) when she declined these advances and told him to stop, Calhoun allegedly laughed and called her a chicken; (3) he asked her explicit personal questions about her sex life with her husband on a daily basis and laughed when she told him that it was "none of his damn business"; (4) he showed her sexually explicit videos on his personal laptop, which Murray told Calhoun were "gross", in response to which Calhoun laughed and called her a chicken; (5) he showed her a picture of a man's penis and asked her if she liked it; (6) he asked Cynthia Murphy if she liked "big chocolate dick" within earshot of Murray;   (7) he kissed her on the cheek while she was sitting at her desk; (8) he allegedly rubbed the top of her leg while she was sitting at her desk and laughed at her when she told him to take his hand off and not to touch her; (9) he slapped her behind several times throughout her employment.

Murray complained to Working Solutions in February 2009 because "it kept getting worse."  After lodging this complaint, the touching stopped for a few weeks before resuming. On April 30, 2009, Murray took medical leave.  Murray alleges that when she met with Calhoun to discuss her return to work, he touched her and tried to rub her leg.  Murray left the meeting immediately.  She contends that shortly thereafter, Calhoun sent her a text message telling her that corporate had decided that she would not be allowed to return to work.

Although Murray admits to knowing that she could have filed an EEOC charge or contacted someone at Spectrum while she was at work, she did not formally complain until after

her assignment ended because she "needed her job." Murray filed an EEOC charge on June 22, 2009. Spectrum received a copy one week later.

Cynthia Murphy began working at the Southaven warehouse through Working Solutions in July 2008. Murphy testified that Spectrum showed her a copy of its sexual harassment policy when she started her assignment. She remembers seeing the complaint procedure for sexual harassment posted throughout the building. Murphy alleges several instances of harassment: (1) Calhoun disclosed explicit details of his sex life and asked the same of her; (2) he engaged in open conversations about the size of his penis; (3) he showed her a slideshow of women with whom he had been having extramarital affairs; (4) Calhoun allegedly eyed Murhpy's genitalia while making a gesture with his tongue, a gesture Murphy interpreted as Calhoun offering to do things beneficial to her employment in exchange for oral sex; (5) he once told her that he would be in the warehouse by himself and that she could come by when everyone else was gone.

Murphy testified that she reported alleged sexual advances on behalf of herself as well as her co-workers to Calhoun early in his short tenure at Spectrum. She later complained to Spectrum Vice President Bailey in January or February of 2009. Murphy reported that she felt that her hours were being cut because she would not "role play with Mr. Calhoun." Bailey denies that Murphy reported Calhoun's alleged sexual indiscretion. Murphy also testified that she reported Calhoun's behavior to Bill Burns and Angela Beach at Working Solutions when her assignment ended because she believed that her complaints to Bailey and Calhoun were the reason for her termination. Spectrum counters that her assignment ended because the hours of her full-time job conflicted with the time she needed to report to work at Spectrum.

Defendant Spectrum has moved for summary judgment, arguing that the EEOC is unable to establish a prima facie case for each class member because Calhoun's alleged conduct was not

7

so severe or pervasive that it altered a term or condition of employment. Spectrum further contends that the *Faragher/Ellerth* affirmative defense forecloses the Commission's claims. Specifically, Spectrum argues that the class members failed to take reasonable steps to report the alleged harassment and that Spectrum took prompt remedial action once it had notice of a complaint. The EEOC opposes summary judgment, arguing that Calhoun subjected the class to actionable harassment under the totality of the circumstances.

Rule 56 permits summary judgment where the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Burfield v. Brown, Moore & Flint, Inc.*, 51 F.3d 583, 588 (5th Cir. 1995). When ruling on a summary judgment motion, the court must construe the facts in the light most favorable to the nonmoving party and "refrain from making credibility determinations or weighing the evidence." *Coury v. Moss,* 529 F.3d 579, 584 (5th Cir. 2008). The nonmoving party cannot rely on metaphysical doubt, conclusive allegations, or unsubstantiated assertions but rather must show that there is an actual controversy warranting trial. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (internal citations omitted).

The parties' first point of contention is whether these claims should be considered in the aggregate, or whether the EEOC must make a prima facie showing for each individual class member. The EEOC instituted this action pursuant to section 706(f), which authorizes the EEOC to bring suit against a private employer on behalf of an individual person or persons aggrieved by the employer's unlawful employment practices. 42 U.S.C. § 2000e-5(f)(1). "Section 706… is addressed to vindication of individual instances of employment discrimination." *Equal*

*Employment Opportunity Commission v. Continental Oil Co.* 548 F.2d 884, 887 (11th Cir. 1977). In bringing a 706 action, "it is axiomatic that the EEOC stands in the shoes of those aggrieved persons in the sense that it must prove all of the elements of their sexual harassment claims to obtain individual relief for them." *E.E.O.C. v. CRST Van Expedited*, *Inc*. 611 F. Supp. 2d 918, 929 (N. D. Iowa, 2009). "§ 706… requires individualized proof of every element of each claim. In particular, the hostile work environment claims will not be considered in the aggregate. Each claimant will be required to satisfy each element of the claim, including severity or pervasiveness, based on their individual experience." *EEOC v. O'Reilly Automotive Inc.* 2010 WL 5391183, *5 (S.D. Tex. 2010). This court adopts this precedent from sister circuits in undertaking to analyze each class member's claim individually.

### A. Title VII Discrimination

Under Title VII of the Civil Rights Act of 1964, "it shall be an unlawful employment practice for an employer… to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of… sex." 42 U.S.C. § 2000e-2(a)(1). "In order to be actionable under [Title VII], a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton* 524 U.S. 775, 787 (1998). The Supreme Court has "directed courts to determine whether an environment is sufficiently hostile or abusive by looking at all the circumstances including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id*. at 787-788.

Under Fifth Circuit precedent, to establish a prima facie case for supervisor sexual harassment, the plaintiff must prove: (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on sex; and (4) the harassment was so severe *or* pervasive that it altered a term or condition of employment. *Watts v. Kroger Co.*, 170 F. 3d 505, 509 (5th Cir. 1999)(emphasis added). For purposes of this motion, the parties agree that the EEOC has satisfied the first three elements of this requisite showing.

"The determination of whether alleged conduct is sufficiently severe or pervasive is not an exact science.…" *Gibson v. Potter*, 264 Fed.Appx. 397, 400, 2008 WL 276309 (5th Cir. 2008). "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris v. Forklift Systems, Inc.* 510 U.S. 17, 21 (1993).

The parties have done an exemplary job in placing before the court a plethora of case law that supports their positions on the contested fourth element of the Commission's prima facie showing. The court has rigorously reviewed and applied this precedent to the allegations in this case. Suffice it to say, the instant action is unique such that this court should make its own "fact-sensitive determination". See *Indest v. Freeman Decorating, Inc.* 164 F.3d 258, 264 (5th Cir. 1999). Specifically, the court finds that the temporary nature of James Calhoun and the class members' employment distinguishes this case from existing precedent. For example, Spectrum cites *Shepard*, in which the Fifth Circuit found no actionable sexual harassment where a supervisor made several inappropriate comments; simulated looking under plaintiff's dress and commented that she had "big thighs" and that "your elbows are the same color as [her] nipples,"; touched her arm on several occasions; rubbed her shoulder down to her wrist; and patted his lap

while saying "here's your seat" numerous times. *Shepherd v. Comptroller of Public Accounts of State of Texas*, 168 F.3d 871 (5th Cir. 1999). *Shepard* involved an employment period of two years, a factor that did not escape the Fifth Circuit's consideration. *Id*. The allegations in this case occurred, in most instances, within employment periods of a few months or less. The decision in *Shepard* would have likely turned out differently had the alleged harassment occurred within such a period. Therefore, the court will analyze each claim considering "all the circumstances", including the temporary nature of the employment in question.

Henderson worked for Spectrum for less than one month between May 12 and June 9, 2009. Within this period, Calhoun allegedly asked her out for drinks five to ten times, rubbed her stomach under her shirt to ask if she was pregnant, and once rubbed his stomach against her as he passed between her and a nearby table. Given Henderson's short employment as well as her observation that Calhoun would either terminate or change women's assignments for turning down his frequent invitations, the court determines that a reasonable trier of fact could conclude that these circumstances constitute pervasive, if not also severe, conduct that altered the conditions of her employment and created an abusive working environment. Summary judgment is DENIED on this claim.

Keisha Anderson also worked for Spectrum for less than a month. However, the court does not find her allegations to be sufficiently severe or pervasive as a matter of law. The court notes that her most severe allegations, that Calhoun asked for lip gloss off of her lips and that he once scratched her leg, are at worst strange and sophomoric. However, scratching one's leg does not rise to the level of severity inherent in unwanted touching in more intimate areas. See *Harvill v. Westward Communications, L.L.C.* 433 F.3d 428, 435 -436 (5th Cir. 2005). Similarly, asking for lip gloss does not evince severe sexual harassment. Having determined that these

allegations are not severe, the court does not find the frequency of her allegations to justify a finding of pervasiveness that would atone for this lack of severity. Therefore, the Commission cannot maintain a hostile work environment claim on her behalf as a matter of law. Summary judgment is GRANTED in this regard.

Brittany Beard worked at Spectrum on two assignments, both of which lasted nearly two months. The court, in denying summary judgment on Beard's claim, notes that many of her allegations are directly tied to her employment and opportunity for advancement. The Fifth Circuit has noted that hostile work environment claims are designed to "level the playing field for women who work by preventing others from impairing their ability to compete on an equal basis with men." *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 593 (5th Cir. 1995).

When Beard asked for her assignment, Calhoun allegedly responded, "maybe [I] just like looking at [you]." Calhoun allegedly twice expressed his disappointment in her for leaving a party at his house, shortly after which he changed her assignment to less desirable work. He terminated her employment shortly after she refused to return to work unless he stopped touching her. Thus, Beard's employment at every turn seemed to be in some way contingent on her receptiveness to Calhoun's advances. In light of the aforementioned allegations, the court finds that Calhoun destroyed Beard's opportunity for advancement and impaired Beard's ability to compete on an equal basis with men because of her sex. Therefore, the nature of these allegations lends itself to being particularly severe, if not also pervasive.

Assuming, *arguendo*, that these facts are insufficient to create a genuine dispute of fact, the frequency of Calhoun's alleged texts and unwanted physical advances coupled with the

aforementioned allegations would allow a reasonable trier of fact to conclude that a hostile work environment existed at Spectrum. Summary judgment is DENIED on this claim.

Murray worked for Spectrum for nearly a year between July 2008 and April 30, 2009. Calhoun allegedly laughed at Murray and called her a chicken on several occasions when she protested Calhoun's behavior. Calhoun allegedly slapped Murray's behind "several times" during her employment. After Murray took medical leave, Calhoun apparently began rubbing her leg in an April 30th meeting in which they discussed her return to work.

The court finds that these allegations pose a similar issue of fact present in Beard's allegations. In particular, the court is of the opinion that when a supervisor makes unwanted physical advances on an employee during a meeting affecting her terms of employment, a genuine issue of material fact exists with regard to the severity of the conduct. This occurrence coupled with her other allegations creates a genuine issue of material fact with regard to both the severity and pervasiveness of Calhoun's conduct towards Murray. Summary judgment is DENIED on this claim.

Cynthia Murphy worked for Calhoun for nearly seven months. Calhoun's alleged behavior towards Cynthia Murphy is highly explicit and inappropriate. The court is aware that Calhoun's alleged comments may not be in and of themselves actionable under a hostile work environment claim. However, Ms. Murphy alleges that Calhoun cut her hours due to her unwillingness to "role play" with Calhoun, and that she interpreted one of Calhoun's gestures as an offer to make beneficial employment decisions for her in exchange for oral sex. Normally, the court would consider such assertions standing alone to be unsubstantiated such that they should be disregarded for purposes of a motion for summary judgment. However, the court does not find them unsubstantiated in light of the number of sexually explicit comments and gestures

directed toward her. Therefore, the court finds these assertions of fact to be severe such that summary judgment is inappropriate on Murphy's claim.

## B. *Faragher Ellerth* Affirmative Defense

Spectrum asserts an affirmative defense pursuant to *Faragher* and *Ellerth*, comprised of two elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998). Spectrum asserts that its promulgated harassment policy is enough to satisfy the first prong. While precedent suggests that such a policy is a substantial consideration in determining whether the defendant exercised reasonable care to *prevent* such behavior, there is a genuine dispute of fact that suggests that Spectrum may not have promptly *corrected* such behavior. See *Faragher*, 524 U.S. at 745; *Casiano v. AT&T Corp.,* 213 F.3d 278, 286 (5th Cir. 2000).

This affirmative defense fails on each claim for purposes of this motion due to Murphy's testimony that she reported, on behalf of the class members and herself, Calhoun's behavior to Vice President Bailey in January or February of 2009. A reasonable jury might accept Murphy's testimony, and, in doing so, reasonably conclude that the four or five month lapse between Murphy's complaint and Calhoun's suspension was not an exercise of reasonable care to correct the behavior, notwithstanding Bailey's denial that Murphy ever complained. Therefore, having noted a genuine dispute of fact on the first element of this defense, the court declines to engage in further analysis under the second prong in denying summary judgment.

## C. TITLE VII RETALIATION

14

The EEOC has brought two claims of retaliation on behalf of Beard and Murphy. The Commission contends that terminating a temporary employee is an adverse employment action. It maintains that Beard engaged in protected activity when she opposed Calhoun's alleged harassment, and that the timing alone can be evidence of causation. With regard to Murphy, the EEOC asserts that she engaged in protected activity when she allegedly complained to Bailey in February, 2009. Spectrum argues that an individual's termination from a temporary position is not an adverse employment action and that "it would be a frustrating expansion of the law… if an entity were essentially required to make a temporary worker a permanent employee merely because they lodged a complaint of discrimination or harassment."

Title VII provides, "It shall be an unlawful employment practice for an employer to discriminate against any of his employees … because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C.A. § 2000e-3. To establish a prima facie case of retaliation in an opposition case, one in which the plaintiff does not allege discrimination following a formal charge, the plaintiff must show that: (1) she participated in activity protected by Title VII; (2) her employer took an adverse employment action against him; and (3) a causal connection exists between the protected activity and the adverse employment action. *McCoy v. City of Shreveport*, 492 F.3d 551, 556 -557 (5th Cir. 2007). If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action. *Id*. If the employer meets its burden of production, the plaintiff then bears the ultimate burden of proving that the employer's proffered reason is not true but instead is a pretext for the real… retaliatory purpose. *Id*.

15

An employee has engaged in protected activity if she has opposed any practice made an unlawful employment practice under 42 U.S.C. § 2000e-3(a). To satisfy this "opposition requirement", the plaintiff need not show that the practice was in fact unlawful, but only that she had a reasonable belief that the employer was engaged in unlawful employment practices. *Turner v. Baylor Richardson Medical Center*, 476 F.3d 337, 348 (5th Cir. 2007). The Fifth Circuit has stated, in essence, that there is "no authority for the proposition that rejecting sexual advances constitutes a protected activity for purposes of a retaliation claim under Title VII." *LeMaire v. Louisiana Dept. of Transp. and Development*, 480 F.3d 383, 389 (5th Cir. 2007). However, informal complaints may suffice so long as they concern some violation of law. *Hagan v. Echostar Satellite, L.L.C.* 529 F.3d 617, 626 (5th Cir. 2008).

Beard did not formally report any alleged sexual harassment to Spectrum, Working Solutions, or the EEOC until after her assignment at Spectrum ended. However, she informally confronted Calhoun about his alleged insinuations that he and Beard were in a relationship; she told Calhoun not to touch her again after he reached around from behind her; and she told Calhoun that she would only return to work if he stopped touching her. The court finds these activities to be more than mere rejections such that they fall within Title VII's purview. Taking Beard's allegations as true, the court further determines that she reasonably believed that Calhoun's behavior was unlawful. Therefore, Beard engaged in protected activity.

Similarly, Murphy told Calhoun to discontinue certain behavior, and she later complained to him about his conduct on behalf of herself and her co-workers. She also complained to Working Solutions officials shortly before her assignment ended. Therefore, Murphy also satisfies the first prong of her prima facie case.

16

Turning now to the second prong, adverse employment action, the court rejects Spectrum's argument that terminating a temporary employee is not an adverse employment action. "It is beyond dispute that a termination constitutes an adverse employment action." *Pegram v. Honeywell, Inc.,* 361 F.3d 272, 282 -283 (5th Cir. 2004). Temporary employment is an important thread in the fabric of our economy, not a license to trample roughshod on Title VII's protections. This reasoning does nothing to suggest that an employer will have to promote a temporary employee because he or she lodged a complaint of harassment. The court simply holds that an employer may not *terminate* such employment on account of same. Therefore, since Calhoun terminated Beard and Murphy, both have established the second prong of their prima facie case.

With regard to the third element, causation, "Close timing between an employee's protected activity and an adverse action against [her] may provide the causal connection required to make out a *prima facie* case of retaliation. However, once the employer offers a legitimate, nondiscriminatory reason that explains both the adverse action and the timing, the plaintiff must offer some evidence from which the jury may infer that retaliation was the real motive." *Swanson v. General Services Admin.* 110 F.3d 1180, 1188 (5th Cir. 1997). However, "in order to establish the causation prong of a retaliation claim, the employee should demonstrate that the employer knew about the employee's protected activity." *Manning v. Chevron Chemical Co., LLC*, 332 F.3d 874, 883 (5th Cir. 2003).

Calhoun terminated Beard's assignment almost immediately following her protest against his unwanted advances. An inference of causation is thus established. Spectrum has advanced a non-discriminatory reason, attendance, for her termination. Therefore, in order to survive summary judgment, the Commission must now present some evidence from which a reasonable

17

juror could infer that this reason was a pretext for retaliation. It appears that Calhoun intended for Beard to return to the company after her medical leave. A reasonable juror could conclude that this proffered reason is pretextual in light of Calhoun's abrupt decision to terminate Beard immediately following an apparent intent to continue her employment. Summary judgment is DENIED on Beard's retaliation claim.

The company ended Murphy's assignment shortly after she complained to Vice President Bailey. The court has found no proof in the record to indicate that Calhoun knew about this protected activity. Therefore, Murphy's claim cannot withstand summary judgment based on this activity. She also asserts that she complained directly to Calhoun on behalf of herself and others within approximately six weeks of Mr. Calhoun's employment beginning in August, 2008. Murphy's assignment ended on February 20, 2009. The temporal proximity required to give rise to an inference of causation must be "very close". *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273 (2001). The Court noted that three and four month periods between the protected activity and the adverse employment action are insufficient for such an inference to arise. *Id*. Therefore, Murphy's termination having occurred, at minimum, five months following this protected activity, her retaliation claim has no support in this regard. Finding no other grounds on which to infer the requisite element of causation, the court determines that summary judgment is GRANTED on the Commission's retaliation clam brought on behalf of Murphy.

### The Equal Employment Opportunity Commission's Motion for Partial Summary Judgment on Defendant's Affirmative Defenses [106]

The Commission moves for partial summary judgment on the following issues raised by Defendant in its Answer to the Complaint:

(1) First Affirmative Defense – Plaintiff has not properly carried out its responsibilities precedent to bringing this action, including, without limitation,

providing Defendant with reasonable notice of the claims alleged in the lawsuit, reasonably investigating the claims alleged in the lawsuit, and making reasonable efforts to conciliate the claims in the lawsuit.

(2) Second Affirmative Defense – All administrative prerequisites to bringing suit, including Plaintiff's obligation to engage in good faith conciliation before filing suit, have not been met by Plaintiff.

(3) Third Affirmative Defense – Plaintiff's harassment claims are barred because Defendant exercised reasonable care to prevent and promptly correct any harassing behavior, Charging Parties and purported class members unreasonably failed to take advantage of preventative or corrective opportunities provided by Defendant or to otherwise avoid harm, and thus Defendant is entitled to the affirmative defense recognized by the United States Supreme Court in *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).

(4) Sixth Affirmative Defense – Some or all of Plaintiff's claims are barred because appropriate administrative remedies have not been properly and fully exhausted.

(5) Seventh Affirmative Defense – The injuries and damages allegedly sustained by the Charging Parties and other purported class members, if any, may have been caused or contributed to by the conduct of third parties for whom Defendant is not responsible.

(6) Ninth Affirmative Defense – Any award of punitive damages, as requested by Plaintiff, would violate the constitution of the United States of America. While denying that Plaintiff is entitled to punitive damages, Defendant affirmatively pleads that an award of punitive damages in an amount in excess of that proportion permitted by the laws of the United States would violate the Due Process protections of the U.S. Constitution. Further, Mississippi laws and procedures governing punitive damages are violative of the 6th Amendment, 8th Amendment, the Due Process and Equal Protection [sic] clause of the 14th Amendment, and other provisions, of the United States Constitution in Article III, Section 14 and other provisions of the Constitution of the State of Mississippi.

(7) Eleventh Affirmative Defense – Defendant pleads all applicable statutes of limitations.

(8) Twelfth Affirmative Defense – To the extent the Complaint asserts or attempts to assert claims under Title VII other than those asserted in a timely charge of discrimination, such claims cannot be maintained.

(9) Thirteenth Affirmative Defense – There was no tangible employment action as to some or all of the individuals identified in the Complaint.

(10) Fourteenth Affirmative Defense – Because Defendant has not yet had an opportunity to conduct any discovery in this matter, and so as to not waive any other applicable affirmative defenses set forth in Rules 8(c) and 12(b), Federal Rules of Civil Procedure, which may be shown to apply by future discovery, all defenses set forth in Rules 8(c) and 12(b) are incorporated herein by reference.

(11) Fifteenth Affirmative Defense – Defendant reserves the right to assert further affirmative defenses as they become evident through discovery or investigation.

In the interest of brevity, the court will present relevant factual background throughout its analysis of these numerous claims.

Turning now to the first and second affirmative defenses, the Commission asserts that it has fulfilled all conditions precedent in this case, including good faith reconciliation.  Prior to bringing suit, the Commission is required to satisfy numerous conditions, including good faith conciliation. See 42 U.S.C. § 2000e-5(f)(1).  In evaluating whether the EEOC has adequately fulfilled this statutory requirement, the fundamental question is the reasonableness and responsiveness of the EEOC's conduct under all the circumstances. *EEOC v. Klingler Electric Corp.*, 636 F.2d 104, 107 (5th Cir. 1981).  In ordering the commission to engage in good faith conciliation efforts, this court previously determined that, "In the present action, it is clear the EEOC did not make a good-faith attempt at conciliation."  See Doc. [13].  The court, in framing this issue most favorably to the non-movant, determines that such an order does not necessarily give the Commission a clean slate on which to contest this affirmative defense.  The court determines that this initial failure alone creates a genuine dispute of fact as to whether the Commission's conduct was reasonable under all the circumstances.  Therefore, summary judgment is DENIED on this affirmative defense.

Spectrum asserts as its sixth and eleventh defenses that the class members did not adequately exhaust administrative remedies and that the statutes of limitations had run prior to the Commission filing suit.  The Commission counters that the statutes of limitations and exhaustion of administrative remedies do not apply to commission enforcement actions.  While the court finds no authority to suggest that the class members or the Commission must individually exhaust administrative remedies in this case, the Commission has its own set of prerequisite burdens on which the court has denied summary judgment, *supra*.  The limitations

defense requires an analysis in conjunction with the parties' next point of contention, Spectrum's twelfth affirmative defense on which the parties dispute the applicability of the so-called "Single-Filing Rule".

Spectrum argues that those class members who did not file a charge of discrimination may not "piggyback" under the single-filing rule on the claims of the two women, Beard and Murphy, who did file a timely charge. Three conditions must be satisfied before a plaintiff may invoke the single filing rule: (1) the plaintiff must be similarly situated to the person who actually filed the EEOC charge; (2) the charge must have provided some notice of the collective or class-wide nature of the charge; (3) the individual who filed the EEOC charge must actually file a suit that the piggybacking plaintiff may join. *Price v. Choctaw Glove & Safety Co., Inc.* 459 F.3d 595, 599 (5th Cir. 2006). On the one contested element in this regard, Spectrum asserts that, "The EEOC's motion fails because it offers no evidence… that Ms. Murphy, Ms. Anderson, and Ms. Henderson are all similarly situated such that they may avail themselves of a charge filed by Ms. Beard or Ms. Murray." While the Commission did not specifically address this element beyond conclusory assertions in the instant motion for summary judgment, the court finds, *sua sponte*, that this element is markedly satisfied. All but one of the class members were a quality control clerk. Murray was an office clerk. All of the class members allege similar acts of indiscretion during their employment under Calhoun at the Southaven, MS Spectrum warehouse. Therefore, the class members are similarly situated and the remaining class members may piggyback off of Beard and Murray if they filed a timely charge with the EEOC.

"In order to sustain a Title VII claim of sexual harassment, a plaintiff must file a charge of discrimination with the EEOC within 180 days of the alleged unlawful employment practice." *Waltman v. International Paper Co.* 875 F.2d 468, 474 (5th Cir. 1989)(quoting 42 U.S.C. §

2000e-5(d)). The limitations period commences on the date that the discriminatory act occurred. *Id*. The Fifth Circuit recognizes an equitable exception to this limitation "where the unlawful employment practice manifests itself over time, rather than as a series of discrete acts." *Id*. The Supreme Court has held that "hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct." *National R.R. Passenger Corp. v. Morgan* 536 U.S. 101, 115 (2002). Therefore, since a hostile work environment claim manifests itself over time, the exception, known as the continuing violation exception, applies. A continuing violation requires the plaintiff to show that at least one incident of harassment occurred within the 180 day period. *Id*. at 476-475.

Undisputed proof in this case demonstrates that Ms. Beard alleges episodes of harassment occurring during her second period of employment at Spectrum between April 1, 2009 and June 10, 2009. She filed a charge with the EEOC in this matter on June 17, 2009. Therefore, this claim was timely filed because at least one alleged episode of harassment occurred during this period, the entirety of which falls within 180 days of June 17, 2009, the date of her filing. The evidence further shows that Calhoun allegedly subjected Murray to harassment on April, 30 2009. She filed her charge with the Commission on June 22, 2009. Having satisfied the 180 day requirement, both Murray and Beard have filed timely charges on which the remaining class members may "piggyback". Therefore, summary judgment is GRANTED inasmuch as it seeks judgment as a matter of law on Spectrum's sixth, eleventh, and twelfth affirmative defenses.

Spectrum asserts in its seventh affirmative defense that the damages and injuries allegedly sustained by the class members may have been caused by third parties, namely, the two temporary employment agencies in question. In its motion for summary judgment, the Commission places before the court an analysis of whether or not Spectrum employed the class

members under a joint employer theory. While this analysis is based on various contested issues of fact, Spectrum concedes that it is subject to liability under such an analysis. In reply, the Commission therefore argues a failure to join under Fed. R. Civ. P. 19. The court does not find such an assertion relevant to this defense, nor does it find a reply brief to be the proper avenue by which to place such a theory before the court. Therefore, summary judgment is DENIED on this claim.

Spectrum's third affirmative defense asserts the *Faragher Ellerth* defense on which the court has previously addressed existing genuine issues of fact, *supra*. In light of such analysis, summary judgment is DENIED on this defense.

Spectrum's thirteenth affirmative defense is that some or all of the class members were not subject to adverse employment actions. Spectrum contends that no causal link exists to constitute an adverse employment action. However, an adverse employment action is adverse despite its cause. Causation is a distinctly separate element than the one addressed in this defense. Calhoun terminated Beard, Murray, Murphy, and Henderson. The court has previously noted that termination is an adverse employment action. 361 F.3d at 282-283. Finding no genuine dispute of material fact on these four terminations, summary judgment is GRANTED on this affirmative defense as it relates to the claims brought on behalf of Beard, Murray, Murphy, and Henderson. This inquiry is moot as it relates to Anderson as the court has dismissed the Commission's claim brought on her behalf.

Spectrum asserts in its ninth affirmative defense that an excessive award of punitive damages would violate the United States Constitution and that there are inadequate safeguards under Mississippi law to prevent such a result. The Commission maintains that punitive damages may be awarded against an employer that engaged in unlawful discrimination. 42

U.S.C. § 1981a(b)(1). The court finds this inquiry to be premature until a jury returns a verdict for punitive damages, not to mention liability. Therefore, summary judgment on this defense is DENIED at this juncture.

In its fourteenth and fifteenth defenses, Spectrum reserves the right to assert additional defenses, incorporating by reference all available defenses set forth in Rules 8(c) and 12(b). The Commission's motion for summary judgment on these defenses is dismissed as moot in light Spectrum's stated intention not to assert additional defenses.

In light of the foregoing, Spectrum's motion for summary judgment [104] is GRANTED in part and DENIED in part. Judgment as a matter of law is hereby entered on the Commission's Title VII discrimination claim on behalf of Ms. Anderson as well as the Commission's Title VII retaliation claim on behalf of Ms. Murphy. All other portions of the motion are DENIED. The Commission's motion for summary judgment [106] is GRANTED in part and DENIED in part. Judgment as a matter of law is hereby GRANTED as it relates to Spectrum's sixth, eleventh, twelfth, and thirteenth affirmative defenses. Same is DENIED on Spectrum's first, second, third, and seventh defenses. The Commission's motion is dismissed as moot as it relates to Spectrum's fourteenth and fifteenth defenses in light of Spectrum's stated intention not to assert further affirmative defenses. Pursuant to Fed. R. Civ. P. 58, a separate order shall issue accordingly.

SO ORDERED, this the 26th day of September, 2012.


**/s/ MICHAEL P. MILLS**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF MISSISSIPPI**

24